**ENDORSED ORDER**

In view of the representations in the Sept. 10, 2010 letter to the court from Brian P. Keenan, Esq., we see no basis for any action by the court in response to this letter.

M/USMJ 9/10/10

# SCHIFFHARDIN LLP

Everett J. Cygal
312-258-5783
ecygal@schiffhardin.com

233 South Wacker Drive
Suite 6600
Chicago, Illinois 60606

t 312.258.5500
f 312.258.5600

www.schiffhardin.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/10/10

September 7, 2010

SEP - 8 2010

**VIA FACSIMILE**

Hon. Michael H. Dolinger
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 17D
New York, NY 10007-1312

Re: Clarendon Nat'l Ins. Co. v. Trustmark Ins. Co., No. 09 cv 9896 (BSJ) (MHD)

Dear Magistrate Judge Dolinger:

We represent Trustmark Insurance Company ("Trustmark"), and we write pursuant to Paragraph 2.A. of Your Honor's Individual Practices.

Under Local Civil Rule 37.2, Trustmark requests a pre-motion conference with respect to two matters: (1) the obstructed and uncompleted September 2, 2010 deposition of Robert Redpath and (2) Clarendon's outstanding discovery response to Document Request No. 8 of Trustmark's First Request for Production of Documents.

For the stated reasons herein, Trustmark respectfully requests that this Court (1) compel Mr. Redpath to appear for approximately one-hour for the remainder of his deposition at a date, time, and place convenient to Trustmark; award Trustmark its expenses, costs, and attorneys' fees in preparation and completion of Mr. Redpath's September 2, 2010 deposition and this letter; and order Clarendon's future witnesses to complete their depositions in one day unless ordered otherwise; and (2) compel Clarendon to provide a complete production in response to Trustmark's Request No. 8.

## I. THE REDPATH DEPOSITION

### A. Clarendon's Gamesmanship with Deposition Dates

In its March 19, 2010 Rule 26(A)(1) Disclosures, Clarendon identified Patrick Fee, Robert Redpath, Alan Mahadeo, and Brian Kass as witnesses with knowledge relating to *inter alia*:

> The negotiation of the settlement and commutation agreements between the parties; the settlement and commutation agreements; the offset agreements between the parties; and Trustmark's repudiation of those offset agreements.

CHICAGO | WASHINGTON | NEW YORK | LAKE FOREST | ATLANTA | SAN FRANCISCO | BOSTON



Hon. Michael H. Dolinger
September 7, 2010
Page 2

On April 5, 2010, Trustmark issued deposition notices for the above witnesses to appear on the following dates: May 11 (Mahadeo); May 13 (Redpath); May 18 (Fee); and May 25 (Kass). After the notices were issued, Clarendon requested that Trustmark agree to different dates for these witnesses and proposed June 17 (Mahadeo); July 7 (Redpath) and July 8 (Fee). A true and correct copy of counsel for Clarendon's May 5, 2010 e-mail is attached hereto as **Exhibit A**.[1] On May 17, 2010, Trustmark agreed to take Mahadeo on June 17 and requested to move Messrs. Redpath and Fee back six days to July 13 and 14, respectively. Also on that date, Trustmark agreed to dates for its principal witnesses on July 20 and August 3 and 5. A true and correct copy of counsel for Trustmark's May 17, 2010 e-mail is attached hereto as **Exhibit B**. The next day, Clarendon advised that it could only make Messrs. Fee and Redpath available "the week of August 30th or in early September." A true and correct copy of counsel for Clarendon's May 18, 2010 e-mail is attached hereto as **Exhibit C**. On June 7, 2010, Clarendon cancelled Mr. Mahadeo's deposition of June 17 "due to a conflict on my [Mr. Ludwig's] end." A true and correct copy of counsel for Clarendon's June 7, 2010 e-mail is attached hereto as **Exhibit D**. Finally, on June 9, 2010, Clarendon agreed to present Redpath and Fee on September 2 and September 9, respectively. A true and correct copy of counsel for Clarendon's June 9, 2010 e-mail is attached hereto as **Exhibit E**.

### B.   Clarendon Terminates the Deposition of Its First Employee Witnesses Early

On September 2, 2010, Mr. Redpath's deposition began as noticed. A true and correct copy of Mr. Redpath's deposition transcript is attached as **Exhibit F** (the "Redpath Trans.").

The transcript shows that the conduct of Clarendon's counsel, Mr. Brett Ludwig, significantly impinged on the time allowed for Trustmark to depose Mr. Redpath under the Federal Rules of Civil Procedure. Mr. Ludwig unilaterally left with his witness in tow before the deposition could be completed.

Pure and simple, the early termination of Mr. Redpath's deposition is just more gamesmanship on the part of Clarendon. After having successfully maneuvered the schedule so that all of its employee witnesses would be deposed after the deposition of Trustmark's witnesses, Clarendon walked out of the deposition attempting to stop the unfavorable testimony being provided by Mr. Redpath. In short, Mr. Ludwig wished to "call a time out." Clarendon's witnesses are subject to seven hours of deposition testimony in one day, just as Trustmark's witnesses were before. Because Mr. Redpath was Clarendon's first party witness, Trustmark writes now to prevent this from occurring again. Clarendon must be reminded that its witnesses are subject to seven hours of deposition testimony on the record in one day.

Realizing that his conduct went well beyond what is permitted by the Rules, Clarendon's counsel sent an e-mail the next day coyly asking "if you want to continue Mr. Redpath's deposition." Mr. Ludwig then presented two dates that impaired counsel's preparation for Mr. Fee's deposition. A true and correct copy of counsel for Clarendon's June 9, 2010 e-mail is attached hereto as **Exhibit G**.

---

[1] Trustmark's exhibits will follow by messenger the morning of Wednesday, September 8, 2010.



Hon. Michael H. Dolinger
September 7, 2010
Page 3

### C. Walking Out

Well after the start of Mr. Redpath's deposition, Mr. Ludwig announced that he had a plane to catch and, therefore, had to leave by 6:00 p.m. The transcript shows that, after asking to start the deposition at 9:30 a.m., Mr. Ludwig and Mr. Redpath did not appear until after 10:00 a.m. Subsequently, Mr. Ludwig and Mr. Redpath departed before the conclusion of the deposition for no good reason. At first, Mr. Ludwig attempted to blame the timing on Hurricane Earl, but later admitted that he intended to leave New York Thursday afternoon before the Hurricane was a potential issue. Then, Mr. Ludwig took issue with the scope of the deposition. Overall, Mr. Ludwig provided no reasons under the Federal Rules of Civil Procedure to terminate Mr. Redpath's deposition:

> MR. LUDWIG: We are going to leave in about five minutes.
> As I indicated yesterday, we were happy to start early. You declined my invitation to start at 9:30. It ended up Mr. Redpath's train was late, so it wouldn't have mattered anyway.
> But I do have a plane to catch. There is a hurricane coming to the East Coast and I don't intend to get stuck here in New York.
> As I indicated before, to the extent you want to use up your entire seven hours of Mr. Redpath, we're happy to make arrangements to produce him again.
> In fact, we're all gonna be back here in New York next week, I think that would be an opportune time to wrap this up.
> MR. CYGAL: So are you saying you made your -- change your flight based on the impending hurricane?
> MR. LUDWIG: No.
> MR. CYGAL: So you booked your flight leaving today, before you knew that there was a hurricane?
> MR. LUDWIG: Yes.
> MR. CYGAL: You should, Mr. Ludwig, make reservations that keep you in a position to be able to comply with your duties under the federal rules, which is seven hours on the record.

Ex. F, Redpath Trans. at pp. 339:5-340:10.

Clarendon deliberately chose to file suit in the Southern District of New York and if that is an inconvenient forum for Clarendon's Milwaukee-based counsel, Clarendon should retain counsel in New York who can complete a seven-hour deposition.

### D. Argument

Under Rule 30(d)(1), a party has at least seven hours over the course of one day to depose an individual. *See* Fed. R. Civ. P. 30(d)(1). Moreover, under Rule 30(d)(3), a deposition may only be terminated "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3).



Hon. Michael H. Dolinger
September 7, 2010
Page 4

  Mr. Ludwig's premature termination of Mr. Redpath's deposition impeded and frustrated counsel for Trustmark's examination. Because of Mr. Redpath's critical role in the facts underlying both Clarendon's Complaint and Trustmark's Counterclaim, counsel for Trustmark and Trustmark representatives spent a significant amount of time preparing for Mr. Redpath's deposition. But Mr. Ludwig's contemptible conduct baselessly hindered and obstructed counsel for Trustmark's full examination of Mr. Redpath.

  Trustmark will be prejudiced if it is unable to complete the deposition of Mr. Redpath. Mr. Redpath was a key witness to the events at issue and directly participated in the reinsurance transactions and agreements at issue. As Mr. Redpath testified, he is the General Counsel at Clarendon. Ex. F, Redpath Trans. at p. 25:21-23. He was and is deeply involved with and knowledgeable regarding the current litigation, the underlying transactions, the prior arbitration, its concurrent negotiations, the confirmation proceeding, related reinsurance, and Clarendon's case theory, among other things. Id., 5:17-25:7. Mr. Redpath's evidence simply cannot be obtained from any other source.

  Accordingly, Trustmark respectfully requests that this Court (1) compel Mr. Redpath to appear for approximately one-hour for the remainder of his deposition at a date, time, and place convenient to Trustmark; award Trustmark its expenses, costs, and attorneys' fees in preparation and completion of Mr. Redpath's September 2, 2010 deposition and this letter; and (3) order Clarendon's future witnesses to complete their depositions in one day unless ordered otherwise.

## II. REQUEST NO. 8

### A. Clarendon's Claim for Millions in Interest From Trustmark

  Clarendon demands over $3 million in interest from Trustmark for Trustmark's supposed breach of the offset agreements. According to Clarendon, Trustmark owes Clarendon interest back to the date that the various commutation agreements were finalized. See Comp. [Doc. No. 1], ¶¶ 11, 21, 26, 54, 59, 64, 69 & 74. What Clarendon has not told the Court is that Clarendon placed in the Side Letters to these transactions (Letters not attached to the Complaint but which amended the terms of the agreements) the following language:

> Clarendon and Trustmark shall work together in good faith to mutually agree upon the specific claims or amounts that would be <u>deemed paid or satisfied by Clarendon</u> under the treaties on account of the setoff hereunder and to document such agreement in appropriate form <u>to enable Clarendon to properly bill its outbound reinsurers.</u>

  During Mr. Redpath's deposition, he first denied that Clarendon made any payments to Trustmark:

    Q. And that was done and accomplished by Clarendon's payment to
Trustmark under either the Variable Quota Share or International excess of loss treaties?
    MR. LUDWIG: Object to the form of the question.
    A. Yeah, I don't understand what you mean by Clarendon's payment.



Hon. Michael H. Dolinger
September 7, 2010
Page 5

> Q. Clarendon didn't make payments to Trustmark on the Variable Quota Share and International treaty at the time that Trustmark was settling its disputes with Clarendon?
> A. That's correct, because Trustmark didn't have a liquidated claim. I think history on the International has shown that.

Ex. F, Redpath Trans. at p. 22:9-23.

Despite claiming that Clarendon did not pay Trustmark per these offset agreements, Mr. Redpath admitted that Clarendon nevertheless billed its reinsurers as if it had paid claims to Trustmark. Id., pp. 22:24-23:16. Mr. Redpath also testified:

> Q. And reinsurance contracts are contracts of indemnity; are they not?
> MR. LUDWIG: Object to the form of the question, calls for a legal conclusion.
> A. Yeah, that's a legal conclusion, but, yes.
> Q. I mean, how -- how long have you been General Counsel of Clarendon?
> A. Since April 1st, 2006.
> Q. And prior to that, you worked for Clarendon in the legal department, right?
> A. That's correct.
> Q. This concept of reinsurance contracts being contracts of indemnity, that's not something new to you; is it?
> A. No.
> Q. Okay. And most reinsurers say we don't pay -- we only pay claims that have actually been paid, right?
> A. When we did the offsets, you know, we were under the understanding that we'd done an offset with Trustmark, and we'd effectively paid Trustmark X dollars for claims.
> Q. You had paid claims, and that's what you told your reinsurers?
> A. That's correct.
> Q. And you expected your reinsurers to pay because reinsurance contracts are contracts of indemnity, you had paid something, they now owe you, right?
> A. That's correct.
> Q. Did you tell your reinsurers that we paid these claims, and four years later, we might change them to some other claims?
> A. I can't recall. We may have, but I don't recall.

Id., pp. 25:15-27:2.

Mr. Redpath also stated that Clarendon reported to John Hancock, one its reinsurers that it had paid claims to Trustmark, absent Clarendon's *de minimis* retention, Clarendon would have been made whole for the sums that it now claims that Trustmark did not pay to it:



Hon. Michael H. Dolinger
September 7, 2010
Page 6

> Q. And assuming Hancock did pay that, Clarendon then would have had cash or monies somewhere close to this amount compensating Clarendon for its payment to Trustmark, right?
> A. We would have had some amount, yes. Sorry, just one caveat there. Assuming Hancock had paid us.
> Q. And if Hancock didn't pay you or paid late, you would have been entitled to ask for interest on those sums from John Hancock, right?
> A. Possibly, yes.
>
> \* \* \*
>
> Hancock is paying claims to Clarendon under the Raydon whole account, right?
> A. They're currently paying claims, yes.
> Q. Okay. So they haven't rescinded, and they – and they are current on their payments, right?
> A. Yes. I believe so, yes.

Id. pp. 35:6-36:2.

### B. Request No. 8

On April 2, 2010, Trustmark served Clarendon with its First Request for Production of Documents. Request No. 8 asked for:

> All reporting, billing or claims advice from Clarendon to any reinsurer or retrocessionaire, including without limitation the John Hancock Life Insurance Company, seeking or purporting to seek reimbursement for any claims purportedly paid, by offset or otherwise, by Clarendon to Trustmark on the October 1, 1998 International II Excess of Loss Treaty ("International II") and the June 1, 1998 Variable Quota Share ("VQS II").

On May 6, 2010, in response to Trustmark's requests, Clarendon objected to Request No. 8 and refused to produce any responsive documents. Subsequently, Clarendon produced only billings to one of its reinsurers, the John Hancock Life Insurance Company, from 2007 on. A true and correct copy of these e-mail negotiations is attached as **Group Exhibit H**. Trustmark then requested that Clarendon produce all responsive documents. A true and correct copy of counsel for Trustmark's August 12, 2010 letter is attached as **Exhibit I**.

On August 21, 2010, Clarendon refused to produce further documents. A true and correct copy of Clarendon's letter is attached as **Exhibit J**. Specifically, Clarendon stated that "Clarendon has produced all of the documents called for by Trustmark's Document Request No. 8, which concerns Clarendon's billing of its retrocessionaires for claims under the 1998 VQS and 1998 International Treaties." Ex. J, p. 1. Clarendon continued that John Hancock was "the only reinsurer that has been billed for claims Clarendon paid, by offset or otherwise, under the 1998 VQS and 1998 International



Hon. Michael H. Dolinger
September 7, 2010
Page 7

Treaties" and refused to provide relevant correspondence because "[t]he request does not actually call for all correspondence with reinsurers relating to such billings." Id., pp. 1, 2.

Trustmark has good cause to believe that Clarendon's production is materially deficient for various reasons. First, despite Clarendon's misleadingly deliberate and narrow characterization, Request No. 8 is clear and broader than billings to retrocessionaires.

Second, even though Clarendon has produced certain of the reports that it sent to Hancock, these reports do not cover all of the relevant timeframe. One of the first offset agreements between the parties—the "$930,665.00 1999 Agency Captive Agreed Allocation," as defined in Trustmark's First Request for Production—was concluded no later than around November 2003, and Clarendon has produced reports beginning with the third quarter of 2007, more than four years later. Clarendon has not accounted for this offset and subsequent offsets through the second quarter of 2007.

Third, Clarendon's argument that Request No. 8 does not call for relevant correspondence is incorrect and a flawed representation of the parties' failed discovery negotiations. It would be virtually impossible to provide accurate reporting, billing, or claims advice materials without the corresponding, and likely attached, correspondence. Although Clarendon requested that Trustmark so limit its request, it did not do so. In fact, in response to Mr. Ludwig's e-mail seeking Trustmark's agreement to a protective order, counsel for Trustmark stated:

> The request is not limited to John Hancock and it is broader than quarterly billing statements. Request No. 8 calls for the production of all reporting, billing or claims advice, which includes, by way of example but not by limitation: provisional reporting, shadow reporting or any other communications with reinsurers referring or relating to the offsets.

Group Ex. H, May 28, 2010 e-mail from E. Cygal to B. Ludwig. Clarendon did not object.

Finally, Clarendon's current contention that John Hancock is Clarendon's only reinsurer does not comport with its previous communications. In support of Clarendon's prior request for a protective order, Clarendon stated on several occasions that Trustmark's request sought documents sent to multiple reinsurers and retrocessionaires other than John Hancock. On June 2, 2010, when contesting productions of responsive documents, counsel for Clarendon wrote:

> We also do not understand why you require (or want) all of the billings that Clarendon has sent to *other reinsurers*. The bordereaux for these billings are identical to the bordereaux submitted with the Hancock billing.

Group Ex. H, June 2, 2010 e-mail from B. Keenan to E. Cygal (emphasis added).) Previously, on May 28, 2010, counsel for Clarendon similarly asserted:

> To be clear, we would give you all billings to Hancock and the accompanying bordereaux as well as any correspondence or communications relating to the offsets or our billing of



Hon. Michael H. Dolinger
September 7, 2010
Page 8

them. This would include any shadow or provisional billings that include the offsets. My belief is that the billings are quarterly, but if there are others they would also be produced. Is there a reason you need billings to *other retrocessionaires*? The accompanying bordereaux would be the same so the Hancock documents would give you the information that you contend is relevant in your letter.

Group Ex. H, May 28, 2010 e-mail from B. Ludwig to E. Cygal (emphasis added).) Crucially, Mr. Ludwig reiterated the same in his letter to this Court:

> There is no facially obvious link between, on the one hand, amounts *Clarendon sought from its reinsurers or retrocessionaires for payments it made by set off to Trustmark* on these separate agreements and, on the other, Clarendon's claims against Trustmark . . . .

A true and correct copy of Mr. Ludwig's letter is attached as **Exhibit K** (emphasis added). Accordingly, part of Trustmark's basis for pressing this issue is Clarendon's own statements. Moreover, part of the purpose of the $930,665.00 1999 Agency Captive Agreed Allocation was to enable Clarendon to bill its reinsurers.

On August 27, 2010, counsel for Trustmark replied to Clarendon's August 21 letter, requesting a full production of documents responsive to Request No. 8. A true and correct copy of counsel for Trustmark's August 27, 2010 letter is attached as **Exhibit L**.

Earlier today, Trustmark informed Clarendon that it intended to bring this matter to the Court. In its response, Clarendon wrote that it had no further responsive documents to produce based on its own improper and exceedingly narrow interpretation of Request No. 8. A true and correct copy of counsel for Clarendon September 7, 2010 letter is attached as **Exhibit M**. As described above, though, there remains cause to believe that outstanding correspondence, reporting, billing, claims advice, and correspondence exist. Accordingly, Clarendon's letter does not resolve the matter.

Trustmark previously reserved the right to bring to this Court's attention the sufficiency of Clarendon's production responses to this request. Trustmark now respectfully requests that this Court compel Clarendon to provide a complete production in response to Trustmark's Request No. 8.

Trustmark thanks the Court for its attention to these matters.



Hon. Michael H. Dolinger
September 7, 2010
Page 9

Respectfully submitted,

Everett J. Cygal

cc:    Counsel of Record