Robert A. Scher, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016-1314
Tel: 212-682-7474
Fax: 212-687-2329

Brett H. Ludwig, Esq. (pro hac vice)
G. Michael Halfenger (pro hac vice)
Brian P. Keenan, Esq. (pro hac vice)
FOLEY & LARDNER LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin  53202
Tel:  414-271-2400
Fax:  414-297-4900

*Attorneys for Plaintiffs and Counter-Defendants*
*Clarendon National Insurance Company and*
*Clarendon America Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| CLARENDON NATIONAL INSURANCE COMPANY and CLARENDON AMERICA INSURANCE COMPANY, | : : : : |
| *Plaintiffs and Counter-Defendants*, | : Civil Action No. 09-cv-9896 |
| v. | : : |
| TRUSTMARK INSURANCE COMPANY, | : : |
| *Defendant and Counter-Plaintiff.* | |

------------------------------------------------------------x

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1.  During the 1990s, Clarendon wrote a number of insurance programs pursuant to which it issued policies for workers' compensation and other similar lines of insurance.

(Redpath Decl. ¶ 2.)

2. To reinsure itself for this business, Clarendon entered into agreements or "treaties" covering each of the programs it wrote. (Redpath Decl. ¶ 2.)

3. One of the companies that reinsured Clarendon and its programs was Trustmark. (Redpath Decl. ¶ 2.)

4. Among the Clarendon programs that Trustmark reinsured were the: (1) Hallmark Program; (2) MELEX Program; (3) BIG I Program; (4) 1998 Agency Captive Program; and (5) 1999 Agency Captive Program (collectively the "Clarendon Programs"). (Redpath Decl. ¶ 3; Trustmark Answer ¶¶ 7, 12, 17, 22, 27.)

5. By 2005, Clarendon found itself in disputes with Trustmark and other reinsurers concerning balances due under these treaties. (Redpath Decl. ¶ 4.)

6. To resolve these disputes, Clarendon agreed to accept reduced but liquidated amounts in exchange for "commuting" the treaties and releasing the reinsurers from further liabilities. (Redpath Decl. ¶ 4.)

7. Ultimately, Clarendon and Trustmark entered into written settlement and commutation agreements for each of the Clarendon Programs. (Redpath Decl. ¶ 4.)

8. On October 20, 2005, Clarendon, Trustmark, and other parties entered into the 1999 Agency Captive Settlement Agreement under which Trustmark was to pay Clarendon initial consideration of $1,906,943. (Redpath Decl. ¶ 6 & Ex. 30.)

9. The 1999 Agency Captive Settlement Agreement also provided for a second payment to cover future "incurred but not reported" liabilities, which Trustmark and Clarendon later agreed equaled $138,249. (Redpath Decl. ¶ 6; *Id.* Ex. 30, § 3 & Ex. 31, §§ 1-2.)

-3-

10. In March of 2003, Trustmark had agreed to bring the balances due on the 1999 Agency Captive program current through December 31, 2001. (Redpath Decl. ¶ 6.)

11. The amount of cash Trustmark paid to Clarendon at that time was reduced by a $930,665.39 offset against balances claimed by Trustmark under the 1998 VQS Treaty. (Redpath Decl. ¶ 6 & Ex. 12; Keenan Decl. Ex. 9; Counterclaim ¶¶ 18, 20.)

12. Trustmark later removed credit for this $930,665.39 offset from its billing to Clarendon under the 1998 VQS Treaty. (Redpath Decl. ¶ 7 & Ex. 44; Keenan Decl. Ex. C (Ferguson Tr. at 125); Keenan Decl. Ex. D (Lester Rule 30(b)(6) Tr. at 39).)

13. On November 30, 2005, Clarendon, Trustmark, and other parties entered into the Hallmark Settlement Agreement under which Trustmark was required to pay Clarendon $3,679,439 within 10 business days. (Redpath Decl. ¶ 8 & Ex. 33; Counterclaim ¶¶ 29, 31.)

14. Interest on unpaid balances accrues at 8% per annum under the Hallmark Settlement Agreement. (Redpath Decl. Ex. 33, § I.)

15. On December 29, 2005, Clarendon and Trustmark entered into the MELEX Settlement Agreement under which Trustmark was required to pay Clarendon $3,029,866. (Redpath Decl. ¶ 9 & Ex. 35; Counterclaim ¶¶ 47, 49.)

16. The MELEX Settlement Agreement did not prescribe an interest rate for unpaid balances, but was explicitly governed by New York law. (Redpath Decl. Ex. 35, § VIII.F.)

17. Under New York law, the statutory interest rate is 9%. *See* N.Y. C.P.L.R. § 5004.

18. On August 11, 2006, Clarendon, Trustmark and other parties entered into the Big I Settlement Agreement under which Trustmark was required to pay Clarendon $68,574 within ten business days. (Redpath Decl. ¶ 10 & Ex. 36; Counterclaim ¶¶ 58, 60-61.)

19. Interest accrues at 6% on unpaid balances under the Big I Settlement Agreement. (Redpath Decl. Ex. 36, § I.)

20. On July 12, 2007, Clarendon, Trustmark and other parties entered into the 1998 Agency Captive Settlement Agreement under which Trustmark was required to pay Clarendon $426,204.88 within five business days. (Redpath Decl. ¶ 11 & Ex. 38; Counterclaim ¶¶ 76, 78-79.)

21. Interest accrues at 6% on unpaid balances under the 1998 Agency Captive Settlement Agreement. (Redpath Decl. Ex. 38, § 1.)

22. At the time Clarendon and Trustmark were negotiating the Settlement Agreements, they had additional disputes over other countervailing balances that Trustmark claimed Clarendon owed it. (Redpath Decl. ¶ 5.)

23. These disputes concerned Clarendon's reinsurance of Trustmark under agreements known as the "1998 International Treaties" and the "1998 VQS Treaty." (Redpath Decl. ¶ 5.)

24. Given these countervailing balances, Clarendon and Trustmark agreed to a commonsense offset arrangement. (Redpath Decl. ¶ 13; Answer ¶ 35.)

25. Clarendon and Trustmark agreed that Trustmark would satisfy its payment obligations under the Settlement Agreements by crediting Clarendon against the disputed amounts Trustmark was claiming under the 1998 International and VQS Treaties. (Redpath Decl. ¶ 13.)

26. In essence, they agreed that Trustmark would "run a tab" with Clarendon as each Settlement Agreement was negotiated. (Redpath Decl. ¶ 13.)

MILW_10367586.1

27. The concept was to settle the tab later, when their disputes over Clarendon's obligations to Trustmark were resolved. (Redpath Decl. ¶ 13 & Exs. 26, 35, 37 & 39.)

28. Unlike the parties' disputes over the Clarendon Programs, the disputes over the 1998 International and VQS Treaties were not then ripe for resolution because Clarendon had broadly reserved its rights, but had not yet audited the underlying Trustmark business. (Redpath Decl. ¶ 5 & Ex. 25.)

29. The parties documented the offset arrangement in the MELEX Settlement Agreement and in three side letter agreements (the "Side Letters"). The first Side Letter, relating to the 1999 Agency Captive Settlement Agreement and the Hallmark Settlement Agreement, specifically allocated $4,512,288 to the 1998 International Treaties, $454,804 to the 1998 VQS Treaty, and $619,290 to a treaty known as the 1997 VQS Treaty. (Redpath Decl. Ex. 26.)

30. The other Side Letters and the MELEX Settlement Agreement reference only offsets against the 1998 International Treaties and 1998 VQS Treaty and did not list specific amounts allocable to either treaty. (Redpath Decl. Exs. 35, 37, & 39.)

31. In these agreements, the parties confirmed that Trustmark's payments under the Settlement Agreements would "be offset against a like amount payable, or claimed to be payable, by Clarendon to Trustmark under the [1998 International and VQS Treaties] Treaties." (Redpath Decl. ¶ 14 & Exs. 35, 37 & 39; Counterclaim ¶¶ 37, 51, 67, 85.)

32. Because of the continued disputes under the 1998 International and VQS Treaties, the parties also agreed that the offsets would be entirely "without prejudice" to Clarendon's rights. (Redpath Decl. ¶ 15 & Exs. 26, 35, 37, & 39.)

-5-

33. By making the offset payments, Clarendon was not agreeing that any claims that were being deemed paid were actually due.  (Redpath Decl. ¶ 15 & Exs. 26, 35, 37 & 39.)

34. The offsets were therefore "entirely without prejudice and subject to a full reservation of any and all rights, remedies or defenses either party may have under the Treaties or any other agreements between the parties."  (Redpath Decl. ¶ 15 & Exs. 26, 35, 37 & 39.)

35. For the avoidance of any doubt, the agreements further provided that the offsets would "not constitute an admission, ratification, or waiver of any right or claim by Clarendon or Trustmark under any agreements between them."  (Redpath Decl. ¶ 15 & Exs. 26, 35, 37 & 39.)

36. For Clarendon's benefit, the parties also agreed that they would accomplish the "without prejudice" offset payments in a manner that would facilitate Clarendon's ability to report and bill the offsets to its own reinsurers even before the disputes over the 1998 International and VQS Treaties disputes were resolved.  (Redpath Decl. ¶ 16.)

37. The Side Letters and the MELEX Settlement Agreement thus contain language providing that the parties would "work together in good faith to mutually agree upon the specific claims" that would be deemed paid by Clarendon so that Clarendon could "properly bill its outbound reinsurers."  (Redpath Decl. Exs. 26, 35, 37 & 39.)

38. The parties did not allocate the offsets to specific claims until March 2007.  At that time, out of more than 15,946 claims included in Trustmark's billings, Clarendon identified 9,366 that it asked be "deemed" paid by offset.  (Redpath Decl. ¶ 17.)

39. Trustmark accepted Clarendon's selection.  Based on the claims deemed paid, the allocation credited $3,823,952.78 in offsets to the 1998 International Treaties, $3,718,201.22 to

-6-

the 1998 VQS Treaty, and $454,804 to another treaty known as the 1997 VQS Treaty. (Redpath Decl. Ex. 40, Counterclaim ¶ 99.)

40. At the time of the allocation, it made no difference to Trustmark which claims were deemed paid. A Trustmark representative has testified which claims were deemed paid "wasn't a huge concern to us" and "in terms of making this allocation, we were sort of just going along with Clarendon." (Keenan Decl. Ex. E (Hawksworth Tr. at 159-60).)

41. Clarendon honored its releases and did not bill Trustmark for any further claims on the Settled Programs. (Redpath Decl. ¶ 12.)

42. Trustmark noted in its 1998 International and VQS Treaties billings that Clarendon was due credits for the amounts due under the settlements on a "without prejudice" basis. (Keenan Decl. Exs. 127, 130, 131.)

43. In July 2008, Clarendon and Trustmark presented evidence to a panel of arbitrators concerning their disputes over the 1998 International Treaties. (Redpath Decl. ¶ 18.)

44. The Settlement Agreements were not a part of the arbitration, although Trustmark in its billings and other exhibits did acknowledge crediting Clarendon with over $4.5 in offsets. (Keenan Decl. Exs. 64 & 65.)

45. The arbitrators excluded two accounts (TIG and ORS) from coverage and held that Trustmark was required to retain the first $25,000 of each loss for which it sought reimbursement. (Redpath Decl. ¶ 19 & Ex. 44, TNY0149701 – 1497092.)

46. The arbitrators also directed Trustmark to prepare a revised billing and to meet and confer with Clarendon over the revisions. (Redpath Decl. ¶ 19 & Ex. 44, TNY0149701 – 1497092.)

47. By finally resolving which claims were actually due from Clarendon under the 1998 International Treaties, the Panel made it possible for the parties to finally allocate a portion of the offsets to specific claims. (Redpath Decl. ¶ 20.)

48. Apparently upset over losing, however, Trustmark refused to do so, setting off a series of events leading to this litigation. (Redpath Decl. ¶ 20.)

49. On November 7, 2008, Trustmark sent Clarendon its first draft of a revised billing under the 1998 International Treaties which purported to credit Clarendon with only $3.8 million of the parties' offsets and would have required Clarendon affirmatively to pay Trustmark even though the balance actually due Trustmark was less than the $10.1 million in offset credits due Clarendon. (Redpath Decl. ¶ 21 & Ex. 43.)

50. The $3.8 million credit in the November 7, 2008 revised billing matched the amount of claims the parties had "deemed" paid under the 1998 International Treaties in their initial March 2007 allocation, although many of the specific claims from that preliminary allocation were no longer due from Clarendon. (Redpath Decl. ¶ 21.)

51. Trustmark also purported to deny Clarendon its share of the minimum premium due and to charge prejudgment interest, without regard to the offsets that Trustmark was not applying. (Redpath Decl. ¶ 22.)

52. The parties were unable to reach agreement over Trustmark's revised billing and returned to the arbitrators for further post-hearing proceedings. (Redpath Decl. ¶ 23.)

53. In those proceedings, Clarendon asked, among other things, that Trustmark be required to credit all of the offsets. (Redpath Decl. ¶ 23 & Ex. 92.)

MILW_10367586.1

54. Clarendon also raised issues concerning the minimum premium that should be credited to Clarendon and whether prejudgment interest was appropriate. (Redpath Decl. Ex. 92.)

55. With respect to prejudgment interest, Clarendon noted that Trustmark's refusal to credit Clarendon with all of the offsets impacted the amount of prejudgment interest (if any) due. (Redpath Decl. Ex. 92.)

56. In response, Trustmark abruptly announced it was withdrawing all of the offsets and submitted yet another revised billing that gave Clarendon no credit for any of the amounts Trustmark owed under the Settlement Agreements. (Redpath Decl. ¶ 24 & Exs. 68 & 93.)

57. Insisting that the Panel lacked jurisdiction over the offsets, Trustmark told the arbitrators they could "only enter a monetary award based upon what is due and owing on the International II, *without reference to any purported offsets that Clarendon may seek to apply at some later date*." (Redpath Decl. Ex. 92 at 7 (emphasis added).)

58. Trustmark stated that "Clarendon and Trustmark **do not** have any understanding with respect to the allocation of offsets" and that it had therefore "withdrawn the credits from its revised billing." (Redpath Decl. Ex. 92 at 1-2 (emphasis in original).

59. On March 20, 2009, the Panel issued a Second Corrected Final Award. (Redpath Decl. ¶ 25 and Ex. 44, TNY0149698-700.)

60. In ruling that Clarendon owed Trustmark $6,645,648 under the 1998 International Treaties, the arbitrators calculated the amount due Trustmark after accounting for the full minimum premium due Clarendon, less the undisputed claims, plus interest on the premium that Clarendon had to return to Trustmark. (Redpath Decl. ¶ 25 and Ex. 44, TNY0149698-700.)

61. The arbitrators made no deduction for any of the Settlement Agreement credits but recognized that Clarendon might satisfy the Final Award other than by affirmative payment, ruling that the balances would be due to Trustmark within 30 days and that "[a]ny amounts not paid or *otherwise satisfied* within thirty days of the date of this order" would accrue 9% interest until paid." (Redpath Decl. ¶ 25 and Ex. 44, TNY0149698-700, ¶ 5 (emphasis added).)

62. On April 6, 2009, within the thirty day time limit in the Final Award, Clarendon's General Counsel Robert Redpath confirmed to Trustmark that Clarendon was satisfying the arbitration award by offset. (Redpath Decl. ¶¶ 26-27 & Ex. 94.)

63. Clarendon acknowledged that it was crediting Trustmark for the entire $6.6 million due under the Final Award against the amounts remaining due under the Settlement Agreements. (Redpath Decl. Ex. 94.)

64. Because Trustmark had repudiated the offset arrangements, Clarendon calculated interest on each Settlement Agreement from the date payment was due, at the rate specified in each agreement or, where silent, at the New York statutory rate. As of April 6, 2009, the total interest Trustmark owed to Clarendon was $3,034,530. (Redpath Decl. ¶ 27 & Ex. 94.)

65. Trustmark refused to accept the satisfaction. In contravention of the deal it had originally struck, the "otherwise satisf[y]" language in the award, and the basic common law of offsets, Trustmark claimed in an April 17, 2009 letter that Clarendon was prohibited from offsetting. (Redpath Decl. ¶ 28 & Ex. 95.)

66. Trustmark argued (incorrectly) that the Panel's ruling precluded any offsets and that Clarendon's offset rights were "contingent upon the outcome of the VQS arbitration." (Redpath Decl. Ex. 95.)

67. Trustmark has removed all credit for offsets from its billing on the 1998 VQS Treaty as well. (Redpath Decl. Ex. 44; Keenan Decl. Ex. C (Ferguson Tr. at 125); Keenan Decl. Ex. D (Lester Rule 30(b)(6) Tr. at 39).)

                                        Respectfully submitted,

Dated: November 19, 2010           FOLEY & LARDNER LLP

                                        _s/Brian P. Keenan_____
Robert A. Scher, Esq.
90 Park Avenue
New York, New York 10016-1314
Tel: 212-338-3405
Fax: 212-687-2329

Brett H. Ludwig, Esq. (pro hac vice)
G. Michael Halfenger, Esq. (pro hac vice)
Brian P. Keenan, Esq. (pro hac vice)
Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Tel: 414-271-2400
Fax: 414-297-4900

*Attorneys for Plaintiffs and Counter-Defendants*
*CLARENDON NATIONAL INSURANCE*
*COMPANY and CLARENDON AMERICA*
*INSURANCE COMPANY*

-11-

**CERTIFICATE OF SERVICE**

This certifies that I caused the STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT to be served on the parties listed below via the Court's ECF system this 19th day of November, 2010.

|  |  |
|---|---|
| Everett J. Cygal | Brian J. Neff |
| David M. Spector | SCHIFF HARDIN LLP |
| Colin M. Proksel | 900 Third Avenue |
| SCHIFF HARDIN LLP | Twenty-Third Floor |
| 6600 Sears Tower | New York, NY 10022 |
| Chicago, IL 60606 |  |

_s/Brian P. Keenan_____
Robert A. Scher, Esq.
90 Park Avenue
New York, New York 10016-1314
Tel: 212-338-3405
Fax: 212-687-2329

Brett H. Ludwig, Esq. (pro hac vice)
G. Michael Halfenger, Esq. (pro hac vice)
Brian P. Keenan, Esq. (pro hac vice)
Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Tel: 414-271-2400
Fax: 414-297-4900

*Attorneys for Plaintiffs*
*CLARENDON NATIONAL INSURANCE COMPANY and CLARENDON AMERICA INSURANCE COMPANY*